**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MEGHAN GLASSON | CIVIL ACTION |
| **v.** | NO. 19-5023 |
| CITIZENS BANK OF PENNSYLVANIA | |

<u>**MEMORANDUM RE SUMMARY JUDGMENT**</u>

Baylson, J.                                                                              June 17, 2021

## I.    Introduction

In this employment case, Plaintiff Meghan Glasson contends that Defendant Citizens Bank of Pennsylvania discriminated against her based on her gender and retaliated against her based on her complaints of unfair treatment.  Defendant contends that it terminated Plaintiff due to her poor performance.  Although there are some disputes of fact, even viewing those facts in the light most favorable to Plaintiff, she still does not have a claim.  Therefore, Defendant's Motion for Summary Judgment will be granted.

## II.    Facts and Procedural History

Plaintiff was employed by Defendant from May 14, 2004 until January 29, 2018.  ECF 1, Compl. ¶ 22.  Plaintiff was promoted from Branch Manager to Regional Manager in October 2015. ECF 30-1, Def. Statement of Undisputed Facts, "DSUF" ¶ 2.  As a Regional Manager, Plaintiff was "responsible for supervising and driving the performance of a collection of individual bank branches within a geographic area."  DSUF ¶ 5.

Citizens Bank uses a metric called profit and loss ("P&L") to measure the financial performance of branches and regions, and to compare the relative performance of its Regional Managers.  ECF 34, Pl. Resp. to Statement of Undisputed Facts, "PSUF" ¶¶ 8, 9.  Regional

Manager P&L rankings are reported based on "peer group," which is a collection of regions based on the overall deposit size of the region.  DSUF ¶ 11.

### a.  Plaintiff's First Year as Regional Manager

During Plaintiff's first year as a Regional Manager her supervisor was Retail Banking Director Jeff Pearlberg, and she was in the $500 to $700 million peer group.  DSUF ¶¶ 3, 12.  For the first half of 2016, Plaintiff's P&L ranking was 19th out of 21 regions.  DSUF ¶ 16.  Plaintiff still received an incentive bonus for this half of the year.  PSUF ¶ 21.  For the second half of 2016, Plaintiff's P&L ranking was 20th out of 20 regions.  DSUF ¶ 17.  In her 2016 performance review, Plaintiff acknowledged that she "had an extremely tough P&L year."  DSUF ¶ 21.  Mr. Pearlberg responded that he "agree[d] with [Plaintiff's] overall assessment" and that "[f]inishing last in the full-year P&L is not good."  DSUF ¶ 21.  Mr. Pearlberg still stated that he felt Plaintiff "ha[d] the clear skills to be a successful [Regional Manager]."  DSUF ¶ 21.  Plaintiff received a 3- rating "driven by her strong coaching skills, her accurate assessment of her BM situation, and the simple fact that this was her first full year as [a Regional Manager]."  DSUF ¶ 23.

### b.  Plaintiff's Second Year as Regional Manager

During Plaintiff's second year as a Regional Manager her supervisor was District Manager Jim Kerr.  DSUF ¶ 4.  Her peer group also changed.  The new group included some branches from the previous group, but the majority were different.  PSUF ¶ 13.  The new group had a deposit range of $700 to $999 million.  PSUF ¶ 13.  In the first quarter of 2017, Plaintiff ranked 21st out of 23 regions.  DSUF ¶ 25.  At that point, in April 2017, Mr. Kerr issued Plaintiff a verbal warning.  DSUF ¶ 26.  He stated that Plaintiff "must show immediate and sustained improvement" including "improvement in P&L performance for your region."  DSUF ¶ 28.

For the first half of 2017, Plaintiff's ranking was 23rd out of 23.  DSUF ¶ 18.  Plaintiff states that this was due to a miscalculation, of which Mr. Kerr was aware, and that she should have been ranked 21st out of 23.  PSUF ¶ 18; ECF 33, Opp'n 5.  Then, in August 2017, Mr. Kerr gave Plaintiff a written warning, which Plaintiff contends was based on the inaccurate ranking.  PSUF ¶ 33.  Plaintiff met with Stephanie McGill, an Employee Relations Case Manager, to discuss her written warning.  DSUF ¶ 44.  Plaintiff told Ms. McGill that she felt Mr. Kerr was retaliating against her, and that it could have been due to her responses to a "climate survey."  PSUF ¶ 37. Citizens Bank conducts climate surveys to anonymously solicit feedback from employees regarding workplace concerns.  DSUF ¶ 38.  Plaintiff also expressed that she felt she had made improvements, but that Mr. Kerr had not provided guidance or clear expectations regarding what improvement was required.  DSUF ¶ 48.

Ms. McGill followed up on her meeting with Plaintiff and spoke with Mr. Kerr on August 21, 2017.  DSUF ¶ 50.  Mr. Kerr then decided to add more detail to the written warning and issued Plaintiff an amended written warning on August 31, 2017.  PSUF ¶¶ 52, 53.  The amended written warning included additional examples of issues that Mr. Kerr and Plaintiff had previously discussed.  PSUF ¶ 54.  Plaintiff told Ms. McGill that she felt Mr. Kerr was targeting her "because all of these things mentioned happened before March and should not have been listed under current issues."  DSUF ¶ 56.  For example, Plaintiff felt that poor results from a "spot check feedback" should not have been included in the written warning.  PSUF ¶ 55.  This "spot check feedback" arose around July 2017 and applied to Plaintiff, Andrew Charlton (another Regional Manager in Plaintiff's peer group), and Jason Tamburro (another Regional Manager in a different peer group). DSUF ¶ 58.  Mr. Kerr held a conference call at the time and informed all three of them of the issues raised in the feedback.  DSUF ¶ 59.  The Employee Relations case notes indicate that when

Plaintiff complained to Ms. McGill regarding her treatment relative to Mr. Charlton and Mr. Tamburro, she stated that she could understand why Mr. Charlton would be treated differently because he was "fairly new," but that Mr. Tamburro "had been there a lot longer" than Plaintiff. ECF 30-28, Def. Ex. 23, 2.

After Plaintiff expressed concern that she was not being given enough time to show improvement, Mr. Kerr told Plaintiff she had until the end of September 2017 to increase her quarterly ranking to the top half in her peer group, which would mean ranking at least 11th out of 23 in the third quarter. DSUF ¶ 64. In the third quarter rankings, at the end of September, Plaintiff was ranked 23rd out of 23. DSUF ¶ 66. However, thereafter, Plaintiff made some improvement. In a November 3, 2017 "flash ranking," Plaintiff was ranked 13th out of 23. PSUF ¶ 68. On November 7, Plaintiff received a final written warning. DSUF ¶ 69. During the fourth quarter of 2017 another flash ranking placed her in 6th, before finishing the quarter ranked 16th. PSUF ¶¶ 69, 70.

During January 2018, Mr. Kerr, Mr. Pearlberg, and Ms. McGill had multiple discussions regarding Plaintiff's termination where they acknowledged her improved performance. PSUF ¶¶ 73–75. Mr. Kerr and Ms. McGill stated that they ultimately decided to offer Plaintiff a Branch Manager position. DSUF ¶ 76. Plaintiff disputes that Mr. Kerr offered her the Branch Manager position. PSUF ¶ 78; Opp'n 11. She states that when she declined to resign her position as Regional Manager, Mr. Kerr fired her. PSUF ¶ 78. Plaintiff notes that five days prior to her termination on January 23, she was ranked 7th out of 23. Opp'n 12. The employee hired to replace Plaintiff was a woman. DSUF ¶ 81.

### c.  Andrew Charlton

4

Plaintiff attempts to demonstrate discrimination by comparing herself to Andrew Charlton. Mr. Charlton was promoted from Branch Manager to Regional Manager in February 2017.  DSUF ¶ 82.  He was in the same peer group as Plaintiff and also reported to Mr. Kerr.  DSUF ¶ 82.  Mr. Charlton's ranking for the first and second halves of 2017 was 22nd out of 23.  DSUF ¶ 84.  In Mr. Charlton's first year end performance review, Mr. Kerr noted his low P&L ranking, but also acknowledged some progress.  DSUF ¶ 87.  The Employee Relations case notes, when discussing Plaintiff's firing, note Mr. Charlton as a "consistency case" and state that he "has not shown improvement after being in his role almost one year."  ECF 30-30, Def. Ex. 25, 2.  In the first half of 2018, Mr. Charlton was ranked 2nd out of 23.  DSUF ¶ 88.

### d.  Procedural History

On May 9, 2018, Plaintiff filed a timely charge with the United States Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC). Compl. ¶ 16.  The EEOC issued Plaintiff a Right to Sue letter on July 30, 2019.  Compl. ¶ 17.  The PHRC issued Plaintiff a letter closing the matter on October 16, 2019.  Compl. ¶ 18.  Plaintiff filed her Complaint on October 25, 2019.  See Compl.

Plaintiff's Complaint alleges four counts against Citizens Bank:

1. **Count I**: Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII);

2. **Count II**: Retaliation in violation of Title VII;

3. **Count III**: Sex Discrimination in violation of the Pennsylvania Human Relations Act (PHRA); and

4. **Count IV**: Retaliation in violation of the PHRA.

Following discovery, Defendant moved for summary judgment on December 30, 2020 (ECF 30, Defendant's Motion for Summary Judgment, "MSJ"), Plaintiff responded on January 20, 2021

(ECF 33, Opp'n), Defendant replied on January 27, 2021 (ECF 35, Reply), and Plaintiff filed a Sur-reply on January 29, 2021 (ECF 40, Sur-reply).[1]  The Court submitted questions to counsel in advance for discussion at oral argument, and held oral argument by recorded telephone conference call on May 18, 2021.  See ECF 44.

### III.    Legal Standard

Summary judgment is proper if the movant can establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine—and will preclude a grant of summary judgment—if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a fact "might affect the outcome of the suit under the governing law," the factual dispute is material and will allow the nonmovant to survive summary judgment.  Id.  Only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" is a grant of summary judgment appropriate.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the district court is obligated to "review the record as a whole and in the light most favorable to the nonmovant, drawing reasonable inferences in its favor."  In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015).

It is the responsibility of the litigant seeking summary judgment to inform the district court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the

---

[1] Plaintiff's Sur-reply addresses Defendant's argument that its Motion should be granted as unopposed due to Plaintiff filing her response one week late.  Plaintiff's counsel explains that he was suffering from COVID-19 and the brief was late due to an "administrative error."  The Court will not grant the Motion on this basis.

burden of proof on a particular issue rests with the nonmoving party at trial, the moving party's initial burden can be met by simply pointing out to the district court "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the moving party has met its initial burden, the nonmoving party must set forth specific facts—through citation to affidavits, depositions, discovery documents, or other evidence—demonstrating the existence of a genuine triable dispute.  Fed. R. Civ. P. 56(c).

## IV.   Discussion

"The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." Weston v. Pennsylvania, 251 F.3d 420, 425 n.3 (3d Cir. 2001).  For this reason, the Court will consider Plaintiff's claims under Title VII and the PHRA, based on the same theory, together.

### a.   Discrimination

The three-step burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), governs Plaintiff's gender discrimination claim.  Under this test, first, a plaintiff must establish a prima facie case of unlawful discrimination.  McDonnell Douglas, 411 U.S. at 802.  If the plaintiff is successful in demonstrating a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the treatment.  Id. at 802–03. Lastly, if the defendant successfully puts forth such a reason, the burden shifts back to the plaintiff to prove that the defendant's explanation is merely a pretext for the discrimination.  Id. at 804–05.

### i.   Prima Facie Case

To establish a prima facie case of discrimination, plaintiffs must show that:

1) they are members of a protected class

2) they were qualified for their positions

7

3) despite these qualifications, they were terminated from the positions

4) they were replaced by someone not in a protected class or someone in a non-protected class, otherwise similarly situated, was treated more favorably.

Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (Joyner, J.) (citing McDonnell Douglas, 411 U.S. at 802). "[T]he prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." Sarullo v. United States Postal Serv., 352 F.3d 789, 797–98 (3d Cir. 2003). "[C]ourts must be sensitive to the myriad of ways such an inference can be created." EEOC v. Metal Service Co., 892 F.2d 341, 348 (3d Cir. 1990).

The parties dispute the fourth element of the prima facie case. Defendant contends that Plaintiff's comparison to another, employee, Andrew Charlton, is inapt because he had been working as a Regional Manager for a shorter time than Plaintiff, and by the time he had been on the job for as long as Plaintiff, he had significantly improved his performance. Defendant also notes that Plaintiff's replacement was a woman. Plaintiff contends that she should also be considered to have been "new" in her role because her region was realigned and she was placed in a new peer group around the same time that Mr. Charlton started as a Regional Manager.

"Although [the Third Circuit] has not explicitly stated what constitutes a similarly situated employee, [it] accept[s] the standard used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects." Wilcher v. Postmaster Gen., 441 Fed. App'x. 879, 881–82 (3d Cir. 2011). "In order to determine who might qualify as a similarly situated employee [the Court] must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 305

(3d Cir. 2004).  "As a general rule, whether individuals are similarly situated is a factual question for the jury.  However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met."  <u>Hampshire v. Bard</u>, 793 Fed. App'x 75, 80 (3d Cir. 2019) (quotation omitted).

Considering the evidence in the light most favorable to Plaintiff contentions, the record demonstrates that Plaintiff and Mr. Charlton were not similarly situated and received similar treatment.  While both were Branch Managers promoted to Regional Manager and assigned to the same peer group and supervisor, the key difference here, as Defendant points out, is the amount of time they each served in the Regional Manager role.  While they both received similarly low P&L rankings during their first year, neither of them received any discipline that year and both were given the same score for their end of year performance reviews.  Plaintiff did not receive her first discipline, a verbal warning, until she had been working as a Regional Manager for eighteen months.  At the equivalent point in Mr. Charlton's career he was second in the P&L rankings.

That Plaintiff was assigned to a new region around the same time as Mr. Charlton started working as a Regional Manager does not change these facts.  Under these circumstances, the amount of time Plaintiff and Mr. Charlton had been working as Regional Managers is highly relevant, as it appears that Plaintiff's managers allowed her a certain amount of time to adjust to her position, as demonstrated by her first performance review, in which Plaintiff and her supervisor agreed that she had a "tough" year but with some work could improve her performance. Being placed in a new region is not equivalent to being new to the Regional Manager role entirely. Whether she should have been given additional time to adjust to her new region is not the question. It is whether she was similarly situated to Mr. Charlton, allowing the court to infer discrimination based on Mr. Kerr's differing treatment.  Plaintiff has not demonstrated that a comparison with

Mr. Charlton is appropriate or that she received worse treatment than he did, given that Mr. Charlton improved his performance significantly within his first year and a half as a Regional Manager.   After considering the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to state a prima facie case of discrimination.   However, assuming arguendo that Plaintiff did establish a prima facie case and acknowledging the fact-intensive nature of the McDonnell Douglas inquiry, which usually weighs against granting summary judgment at this stage in the analysis, the Court will review the remainder of the burden-shifting framework.

### ii.   Legitimate Non-Discriminatory Reason

Assuming that Plaintiff has established a prima facie case of discrimination, the burden of production shifts to Defendant to articulate a legitimate non-discriminatory reason for Plaintiff's firing.   "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."   Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).   Defendant has explained that "it terminated Plaintiff's employment based on her poor performance in the Regional Manager position that failed to improve through the progressive discipline process." MSJ 15.   The Third Circuit has recognized "demonstrably poor job performance" as a legitimate non-discriminatory reason.   See Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014).

### iii.   Pretext

"[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."   Fuentes,

32 F.3d at 764.  "[H]owever, the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Id. at 765 (quotations omitted).  "[T]his standard places a difficult burden on the plaintiff" but "it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs."  Id.

Defendant argues that Plaintiff has not pointed to any evidence which calls into question its legitimate reason for her firing.  Plaintiff asserts that she has shown pretext based on the "cat's paw" theory of liability.  Under the "cat's paw" theory of discrimination, "an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case."  Mason v. SEPTA, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015) (McHugh, J.) (citing McKenna v. City of Philadelphia, 649 F.3d 171, 178 (3d Cir. 2011)).  Plaintiff argues that Mr. Kerr's discriminatory animus towards her led to her firing rather than her poor performance.  In support of this argument, she repeats the ways in which she believes she was treated worse than Mr. Charlton and emphasizes that she was Mr. Kerr's only female direct report.  Plaintiff also argues that she had begun to improve her performance and that instead of acknowledging that, Mr. Kerr continued to punish her.

At oral argument, the Court specifically asked Plaintiff's counsel "what specific facts does Plaintiff contend create a dispute of fact regarding whether her poor job performance was pretext for gender discrimination?"  ECF 46, Hr'g Tr. 21:24–22:1.  Plaintiff's counsel again pointed to

facts which may demonstrate harsh treatment, but do not demonstrate pretext.  Plaintiff's counsel argued that Mr. Kerr admitted to not correcting Plaintiff's ranking

Plaintiff's counsel reiterated several facts from the record, none of which establish pretext.  To begin, he pointed to Mr. Kerr's admission that the rankings were calculated inaccurately for the first half of 2017.  However, even by Plaintiff's own calculation her ranking should have been 21st out of 23.  Next, Plaintiff's counsel asks the Court to infer pretext because Mr. Kerr proceeded with firing Plaintiff after her performance had improved somewhat.

Taking the facts in the light most favorable to Plaintiff, the Court will assume that Plaintiff had started to improve her performance before she was fired.  Mr. Kerr discussed this fact with Ms. McGill and decided to move forward with firing her anyway.  However, this evidence does not create a dispute of fact regarding whether Defendant's legitimate non-discriminatory reason should be disbelieved.  While it may "show that the employer's decision was wrong or mistaken" or possibly unnecessary, that is not the same as "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765.  The record demonstrates that the measures which Plaintiff points to as showing her improved performance are not sufficient to show an improvement in her performance because they cover a limited period of a time.  Further, the record shows that Plaintiff never reached the goal that was set for her.  Therefore, even if she may have improved her performance somewhat, she has not shown that the decision to fire her was a pretext for some more insidious reason.

In fact, Plaintiff has not pointed to any evidence to suggest that Mr. Kerr harbored some discriminatory animus towards her.  She simply states that she was his only female employee and

that he treated her worse than others.  This is not sufficient to create a dispute of fact regarding whether Defendant's stated reason for firing Plaintiff was pretextual.

### b. Retaliation

"To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  Moore v. City of Philadelphia, 461 F.3d 331, 340–341 (3d. Cir. 2006) (quotation omitted).

Protected activity can include "informal protests of discriminatory employment practices, including making complaints to management."  Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006).  "When deciding whether a plaintiff has engaged in opposition conduct, [a court should] look to the message being conveyed rather than the means of conveyance."  Id.  When considering the message conveyed, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII."  Id.  "The retaliation provisions of [Title VII] do not protect employees from retaliation for filing any charge alleging any misconduct; to gain protection, the charge - factually supported or not - must allege conduct within the scope of the statute."  Slagle v. County of Clarion, 435 F.3d 262, 267 (3d Cir. 2006) (quoting Philip J. Pfeiffer, Employment Discrimination Law 499 (2002)).  In Slagle, the Third Circuit held that a plaintiff's "vague allegations of 'civil rights' violations" was not protected conduct under Title VII.  Id. at 268; see also Barber v. CSX Distribution Servs., 68 F.3d 694, 701–02 (3d Cir. 1995) (plaintiff's letter complaining of "unfair treatment in general," but not mentioning age discrimination, was not protected activity in an ADEA retaliation case). "The Third Circuit has been clear that an employee has not engaged in protected opposition activity

when he or she complains about unfair treatment but stops short of referencing a protected characteristic as the basis for the unfair treatment."  Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597, 616 (E.D. Pa. 2014) (Buckwalter, J.).

The issue here is whether Plaintiff's complaints to human resources sufficed to put them on notice that she was complaining of gender discrimination, and not just general mistreatment. Defendant argues that Plaintiff has not pointed to any evidence that she "complained of unlawful sex discrimination, or that such a complaint would have been objectively reasonable."  MSJ 20. Plaintiff references two instances which she contends constituted protected activity.  First, when she complained to employee relations in August 2017 that she "received a written warning from [her] manager last week and [she] believe[d] it was a form of retaliation."  Opp'n 13.  Second, Plaintiff states that she continued to complain to employee relations that she felt "targeted because these things mentioned happened before March and should not have been listed under current issues," specifically that Mr. Kerr had included the spot check feedback in her Amended Written Warning.  Plaintiff argues that she later learned that neither of her male colleagues were disciplined for the spot check feedback and that therefore "[i]t follows that Plaintiff's complaint about being targeted was in the context of being singled out from her male co-workers also under Mr. Kerr's supervision."  Opp'n 14.  Lastly, Plaintiff argues that because the Employee Relations notes state that they "discussed non retaliation and confidentiality policy" it is clear that employee relations treated her complaints as protected activity.

Plaintiff has not made out a prima facie case of retaliation because she cannot demonstrate that any of her complaints included any suggestion that she was complaining of gender discrimination.  Plaintiff's complaints are comparable to those made by the plaintiff in Paradisis v. Englewood Hosp. Med. Ctr., 680 Fed. App'x. 131, 138 (3d Cir. 2017).  In that case, the panel

held that "[f]iling grievances unrelated to discrimination does not . . . constitute protected activity for purposes of a Title VII retaliation claim." Id.  The plaintiff filed a grievance through her union but "made no reference whatever to discrimination based on skin color or national origin" and therefore her complaint "failed to identify any conduct proscribed by Title VII." Id.  A second grievance "also made no mention of any type of discrimination protected by Title VII." Id.  A third grievance included "the sole reference to discrimination" which "was the reference to a contract section entitled 'Non-Discrimination.'" Id.  However, the Third Circuit noted that "[t]he mere mention of discrimination, however, does not transform a general grievance into opposition to unlawful activity under Title VII." Id. (citing Slagle, 435 F.3d at 268).

As in Paradisis, the record shows that Plaintiff made several complaints, but that none of them included even a reference to gender discrimination.  Plaintiff's argument that Ms. McGill should have inferred that Plaintiff was making a complaint of gender discrimination because her "complaint about being targeted was in the context of being singled out from her male co-workers also under Mr. Kerr's supervision" is not enough to constitute protected activity.  There is nothing in the record which suggests that Plaintiff made any reference to her gender or to any type of discrimination.  Such a vague reference which would require significant unfounded inference on the part of Ms. McGill is not adequate to raise a question of fact regarding whether Plaintiff engaged in protected activity.  At oral argument, the Court specifically asked Plaintiff's counsel if there is a Third Circuit or Supreme Court case which held that something as vague as Plaintiff's complaints would create a dispute of fact on this issue, and Plaintiff's counsel stated that he would "revisit the law."  Hr'g Tr. 31:7–16.

However, assuming arguendo that Plaintiff did establish a prima facie case of retaliation, and considering Defendant's asserted nondiscriminatory reason for Plaintiff's firing, the Court

15

once again finds that Plaintiff has failed to establish pretext on the issue of retaliation, for the reasons explained above.

## V.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted. An appropriate Order follows.

O:\CIVIL 19\19-5023 Glasson v Citizens Bank\19cv5023 Memo Re MSJ.docx